# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | | |
|---|---|---|
| SPRINT SOLUTIONS, INC.<br>a Delaware corporation<br>6480 Sprint Parkway<br>Overland Park, Kansas 66211<br>Johnson County; and<br><br>SPRINT COMMUNICATIONS<br>COMPANY, L.P.<br>a Delaware limited Partnership<br>6480 Sprint Parkway<br>Overland Park, Kansas 66211<br>Johnson County,<br><br>Plaintiffs,<br><br>v.<br><br>UNWIRED SOLUTIONS, INC. d/b/a LINQ<br>SERVICES, INC., a Maryland corporation<br>6679 Santa Barbara Road, Suite D<br>Elkridge, Maryland  21075<br>Howard County;<br><br>KEVIN A. LOWE<br>10037 Davis Avenue<br>Woodstock, Maryland 21163<br>Baltimore County;<br><br>BRENDAN T. SKELLY<br>4263 Samhill Court<br>Mount Airy, Maryland 21771<br>Frederick County;<br><br>NICOLE WILLIAMS<br>5557 Dolores Ave<br>Halethorpe, Maryland  21227<br>Baltimore County;<br><br>MALLORY ZIMMERMAN<br>802 Country Club Drive | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No: _____<br><br><br>**JURY TRIAL DEMANDED** |

Pittsburgh, Pennsylvania  15228                )
Allegheny County;                              )
                                               )
TIFFANY FULCHER                                )
8217 Bernard Drive N                           )
Millersville, Maryland  21108                  )
Anne Arundel County; and,                      )
                                               )
JOSEPH C. DAVIS, JR. a/k/a                      )
TONY DAVIS                                      )
2 Redgate Ct.                                  )
Catonsville, Maryland  21228                   )
Baltimore County;                              )
                                               )
        Defendants.                            )

---

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Sprint Solutions, Inc. and Sprint Communications Company L.P. (collectively "Sprint" or "Plaintiffs"), hereby file this Complaint for Damages and Injunctive Relief against Unwired Solutions, Inc., Unwired Solutions, Inc. d/b/a Linq Services, Inc., Kevin A. Lowe, Brendan T. Skelly, Nicole Williams, Mallory Zimmerman, Tiffany Fulcher, and Joseph C. Davis, Jr. a/k/a Tony Davis (collectively, "Defendants") and state:

### INTRODUCTION

1.      Sprint's business model is based upon Sprint's ability to deliver an affordable and up to date product to its consumers.  Therefore, Sprint subsidizes its customers' acquisition of its specially-manufactured wireless telephones designed for use on Sprint's wireless service under the brands Sprint, Sprint Prepaid, Boost Mobile, Virgin Mobile, payLo, and Assurance Wireless (collectively, "Sprint Phones" or "Phones").  Sprint provides these Phones to its customers for substantially less than the Phones cost Sprint, or through zero interest installment plans or low cost lease arrangements.  Sprint recoups these subsidies through profits earned on

the sale of Sprint service, which is required to make and receive calls and text messages on, and transmit data through, the Sprint Phones.  Sprint is able to offer its Phones to customers at reduced prices only if the Phones are used as intended on the Sprint wireless network.

2.     Defendants and their co-conspirators are perpetrators of an unlawful scheme (the "Bulk Handset Trafficking Scheme" or the "Scheme") to profit from the illegal acquisition and resale of new Sprint Phones, by targeting Sprint customer accounts and by stealing the substantial financial investment that Sprint makes in its Phones, for their own profit and to the detriment of Sprint and its customers.

3.     As part of the Bulk Handset Trafficking Scheme, the Phones, which may be purchased and sold multiple times, ultimately end up in the hands of someone other than the consumer with whom Sprint has a business relationship.   Along the way, the Phones are oftentimes "unlocked" so they will operate on a wireless network other than Sprint's.  Often the ultimate user of the phone is located overseas, in a country where the wireless service provider does not underwrite the cost of new phones.  Although most handset traffickers resell their phones overseas, where carriers do not subsidize phones, Defendants' business model includes selling trafficked phones domestically, for use by major retailers in their warranty programs.

4.     Defendants and their co-conspirators have conspired to create phone trafficking businesses that earn them millions of dollars annually by unlawfully purchasing and reselling subsidized Sprint phones.  Defendants' business model diverts Sprint's subsidies from Sprint's legitimate customers, turning those funds into Defendants' profits.  Although Defendants may participate in less than all of the steps in the process of diverting Sprint Phones, each of Defendants' acts is a violation of Sprint's rights and causes significant damage to Sprint.

Additionally, as participants in the conspiracy, Defendants are liable for the harm caused to Sprint by the entire Scheme.

5.      The Scheme causes tremendous harm to Sprint and to consumers.  In addition to the pecuniary losses caused by Defendants' misappropriation of Sprint's mobile devices, investment in the Phones, lost sales and market expenses, and lost expected customer revenue, Defendants' misconduct has harmed Sprint's relationships with its customers, dealers, retailers, and others.  Defendants' Scheme also involves unlawfully accessing Sprint's protected computer systems and wireless network; trafficking of Sprint's protected and confidential computer passwords; willful infringement of Sprint's trademarks; and/or stealing legitimate customer upgrades.

6.      Sprint seeks to recover damages for the harm caused by Defendants' Bulk Handset Trafficking Scheme, and to obtain an injunction prohibiting Defendants from continuing to perpetrate the Scheme.

7.      All conditions precedent to filing this action have been performed, waived or excused.

8.      Sprint has retained the undersigned attorneys to represent it in this action and has agreed to pay its attorneys a reasonable fee for their services.

## PARTIES, JURISDICTION, AND VENUE

9.      This is an action for damages in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees.

10.      Sprint Solutions, Inc. is a Delaware corporation, with its principal place of business in Reston, Virginia.

11.     Sprint Communications Company L.P. is a Delaware limited partnership, with its principal place of business in Overland Park, Kansas.

12.     Defendant Unwired Solutions, Inc. d/b/a Linq Services, Inc. ("Linq") is a Maryland corporation with its principal place of business in Elkridge, Maryland.

13.     Defendant, Kevin A. Lowe ("Lowe") is an individual and a resident of Baltimore, Maryland and upon information and belief is an owner, President, and agent of Linq, and personally engaged in, and helped facilitate and further, the improper conduct described herein.

14.     Defendant, Brendan T. Skelly ("Skelly") is an individual and a resident of Mount Airy, Maryland and upon information and belief is an owner, Vice President, and agent of Linq, and personally engaged in, and helped facilitate and further, the improper conduct described herein.

15.     Defendant, Nicole Williams ("Williams") is an individual and a resident of Halethorpe, Maryland and upon information and belief is an Account Representative and agent of Linq, and personally engaged in, and helped facilitate and further, the improper conduct described herein.

16.      Defendant Mallory Zimmerman ("Zimmerman") is an individual and a resident of Pittsburgh, Pennsylvania and upon information and belief has been an Account Representative and agent of Linq and personally engaged in, and helped facilitate, the improper conduct described herein.

17.      Defendant Tiffany Fulcher ("Fulcher") is an individual and a resident of Millersville, Maryland and upon information and belief is an Account Representative and agent of Linq, and personally engaged in, and helped facilitate, the improper conduct described herein.

18.     Defendant Joseph C. David, Jr. a/k/a Tony Davis ("Davis") is an individual and a resident of Catonsville, Maryland and upon information and belief is an Account Representative and agent of Linq, and personally engaged in, and helped facilitate, the improper conduct described herein.

19.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338 because Sprint's claims for violation of the United States Trademark Act, Title 15 of the United States Code and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* arise under federal law and because diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of costs, fees, and interest.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Sprint's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

20.     Defendants are subject to the personal jurisdiction of this Court because they are residents of State of Maryland, or because they have conducted, engaged in and carried out business ventures within the State of Maryland; or have committed tortious acts within the State of Maryland; and have engaged in substantial and not isolated activity within the State of Maryland.

21.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants either reside in this district or a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

### SPRINT'S BUSINESS MODEL

22.     Sprint and its affiliates offer a comprehensive range of telecommunications services to consumers, businesses, and government users.  Sprint currently serves more than 56

million customers nationwide, and is widely recognized for developing, engineering, and deploying innovative technologies.  The Sprint companies and affiliates highly value the outstanding business reputation they have worked hard to develop.

23.     Sprint's wireless program enables Sprint customers to choose from a variety of monthly voice and data plans for use on cutting edge devices on the Sprint wireless network.  In addition to being available through Sprint online, over the phone with authorized Sprint customer service representatives, and in its stores, Sprint Phones and wireless service are sold through authorized Sprint dealers and retailers around the country, with whom Sprint has contractual relationships.  In addition, Sprint customers with the proper security information can access their Sprint account to make changes, order equipment and services, identify an equipment delivery location, and make payments.

24.     Sprint protects access to its customers' accounts and their personal identifying information through the use of numerous security mechanisms, including secret PINs, passwords and/or security questions.  After a customer is authenticated through one or more of these security mechanisms, Sprint accesses the customer's account on its secure internal computers and allows the customer to place orders or make changes to his/her account.  The authorized customer can order devices or equipment to be shipped to any address provided by the customer.

25.     Sprint's business model is based upon Sprint's ability to deliver affordable, innovative, and desirable products and services to consumers.  Therefore, Sprint assists its customers in their acquisition of Sprint Phones for use on the Sprint network by selling the Phones for substantially less than what Sprint pays to the manufacturers for the Phones.  Sprint recoups the

money it loses on the Phones through revenue earned on the sale of Sprint service, which customers must use to transmit and receive voice, text, and data on the Sprint Phones.

26.     In addition to subsidizing Sprint Phones, Sprint also offers its customers the option of paying off the Phone in installments or leasing a Phone from Sprint, as well as providing discounts, rebates, and other incentive programs by which Sprint heavily invests in the Phones to the benefit of its customers.  These types of substantial subsidies and investment programs are not offered by telecommunications carriers outside the United States; instead, the consumer must pay full price for the phones from the manufacturers.  The full value of the Phone in the case of theft or the difference between the value and the subsidy price offered by Sprint is the profit sought by handset traffickers.

27.     Sprint Phones are sold subject to terms and conditions ("Terms and Conditions") which conspicuously restrict and limit the sale and use of the Phones.  A copy of the Terms and Conditions is attached hereto as **Exhibit A**.  These Terms and Conditions are set forth in printed inserts that are included with the purchase of every Sprint Phone.

28.     To make its customers' experience as convenient as possible, Sprint provides various methods for its customers to manifest their agreement to the Terms and Conditions, depending on the type of service they obtain and the method and sales channel through which they activate their service.  In some cases, customers are asked to sign a written contract, in others they acknowledge their agreement orally by phone, and in other situations they may indicate their agreement by clicking the appropriate buttons on a website.  In the case of pay-as-you-go or prepaid service, customers confirm their agreement by purchasing a Phone in a package that conspicuously indicates that their purchase or use of the phone constitutes their agreement to the Terms and Conditions.  All of the methods used by Sprint for obtaining its customers' agreement

to the Terms and Conditions are legally valid and appropriate, and the Terms and Conditions constitute a valid and binding contract between Sprint and each of its customers.

29.     Sprint is able to offer its Phones to customers at reduced prices only if the Phones are used as intended on the Sprint wireless network. Manufacturers that produce wireless phones for Sprint install proprietary software, requested and paid for by Sprint, on the Sprint Phones. Among other things, this software is intended to prevent the Phones from being used outside the Sprint network.

30.     Wireless technology is constantly changing and improving, and the wireless industry is intensely competitive. Sprint expends substantial resources to maintain its position as an industry leader and to ensure that its network, handsets, and all of its products and services are at the cutting edge of the latest technological developments. Providing its customers with the highest quality and most advanced technology is a key differentiator for Sprint and central to its business strategy. Sprint is constantly and aggressively developing, engineering, and deploying innovative technologies to benefit its customers.

31.     Sprint invests heavily in efforts to provide its customers with the most up-to-date wireless handsets, and shoulders most or all of the cost of purchasing a new phone for its customers. Sprint makes phones available to new customers at a low cost when they initiate wireless service, and also provides new subsidized phones to existing customers at regular intervals.

32.     Sprint made a particularly significant and widely publicized investment for its customers in the Smartphone market. As reported in The Wall Street Journal, Sprint agreed to buy 30.5 million iPhones from Apple over four years, at a cost of more than $20 billion. Copies of newspaper articles discussing Sprint and the iPhone are attached hereto as **Composite Exhibit**

**B**.   As the demand, and therefore, the price, for Smartphones in various world markets skyrockets, Sprint's subsidized iPhones are a particularly attractive and lucrative target for participants in the Bulk Handset Trafficking Scheme.

33.     Sprint is continuously working to provide its customers with the latest in communications technology.  Sprint's practice of defraying the cost of handsets for existing customers is an essential part of its business model, and facilitates the upgrading of Sprint's network by helping to migrate customers from older technology phones to newer models.  Many of the various wireless transmission standards are not compatible with each other, so Sprint's customers must be upgraded to new Phones before Sprint can transition its network to the latest standard.  New handsets are also needed to utilize different radio frequencies and take advantage of Sprint's acquisition of wireless spectrum from various other companies, so as not to overwhelm Sprint's network and to allow for the most efficient service for all Sprint customers. Stealing the investment in handset upgrades that Sprint intends to benefit its customers therefore harms Sprint not only by misappropriating its investment in the Phones but also by impeding Sprint's ability to upgrade its equipment and network facilities and efficiently and effectively serve its customers.

## SPRINT'S TRADEMARK RIGHTS

34.     Sprint Communications Company L.P. owns federal trademark registrations for the standard character and stylized Sprint® marks (collectively, the "Sprint Communications Marks").  Sprint Solutions, Inc. has been assigned the right to use and enforce the Sprint Communications Marks.  Copies of the certificates of registration issued by the United States

Patent and Trademark Office are attached hereto as **Composite Exhibit C**.  The stylized Sprint

Communications Marks are depicted below:

  

35.      Sprint has been assigned the right to use and enforce the standard character and

stylized Virgin Mobile, payLo, Assurance Wireless and Boost Mobile trademarks (collectively,

the "Assigned Marks"), the latter of which are depicted below:

                



The Sprint Communication Marks and Assigned Marks will collectively be referred to as the

"Sprint Marks."

36.      Sprint uses the Sprint Marks on and in connection with its telecommunications

products and services.

37.      Sprint Marks have become an intrinsic and essential part of the valuable

goodwill and property of Sprint, who protects the Sprint Marks.  The Sprint Marks are well

established and well known to customers and the trade as symbols identifying and distinguishing

Sprint's products and services, and signifying distinctive products and services of high quality.

Only Sprint and its expressly authorized, affiliated agents are permitted to use the Sprint Marks.

The Sprint Marks are valid, distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with Sprint.

## DEFENDANTS' MISCONDUCT

38.     Sprint has discovered that, although large quantities of its Phones are being purchased throughout the United States, a significant number of these Phones are not being used on the proper Sprint account.  Instead, entities and individuals such as Defendants and their co-conspirators are fraudulently acquiring and reselling new Sprint Phones in bulk quantities.  The Phones are acquired, either directly by Defendants or through their co-conspirators, through illicit means, such as by fraudulently inducing Sprint to place orders on existing Sprint customer accounts.  The Phones are then unlawfully sold for a substantial profit to major retailers in their handset warranty replacement programs.  Defendants undertake these actions for their own profit.

39.     Upon information and belief, Defendants and/or their co-conspirators unlawfully ship Sprint Phones directly overseas, where they can be used on other wireless carriers' networks, or ship Sprint Phones to other domestic traffickers, who add them to larger shipments headed overseas.  These Phones are usually taken out of their original packaging, and all accessories, warranties, and manuals are removed, before being shipped overseas.  The Phones are often unlocked by Defendants or their co-conspirators, to raise their value and prepare them for use on foreign carriers.  Once a Sprint Phone is unlocked and/or shipped overseas to be used on other wireless networks, Sprint no longer has a revenue source to recoup its investment on that Phone.  Defendants undertake these actions for their own profit.

40.     If Sprint identifies a Phone as connected with theft, fraud, or other loss, the electronic serial number (ESN) is logged into Sprint's system and the Phone can no longer be used on the Sprint network.  This is done to protect Sprint from further harm and in an attempt to deter criminal activity.  The Phone is thereafter referred to in the handset trafficking community as having a "Bad ESN."  As it is no longer a functioning Sprint Phone, the only value of a Bad ESN Phone is in unlocking the handset for use on other networks and overseas resale.

41.     Defendants knowingly and willfully engage in an enterprise that traffics in and resells new Sprint Phones.  Defendants use fraud and other illicit means to acquire Sprint Phones and sell those Sprint Phones through various co-conspirators.  While the complete extent of Defendants' activities in the Bulk Handset Trafficking Scheme is not yet known, Defendants are actively involved in several integral components of the conspiracy.

42.     Linq is a self-proclaimed provider of wireless account management services.  Linq advertises that it "manage[s] a company's existing account with a small team of dedicated customer service representatives to become a single point of contact for all wireless billing and technical issues."  It further advertises that its clients pay a flat rate for existing carrier monthly cellular service, which includes all carrier surcharges, taxes and overages and is less than what its clients paid directly to the carrier.  Linq also advertises that its consulting and premier customer care is included in its less expensive flat rate.  A true and correct copy of Linq's LinkedIn page is attached hereto as **Exhibit D**.

43.     Upon information and belief, Linq is able to offer its customers lower, flat rates for monthly cellular service because they are earning substantial profits by ordering highly discounted upgrade Phones on its customers' accounts and reselling them.

44.     Upon information and belief, Defendants' underlying motivation in performing their wireless account management services is to gain control of Sprint customer accounts for the purpose of acquiring subsidized Sprint Phones for resale.  Defendants acquire the account credentials of Sprint customers, which allows Defendants to make changes to Sprint accounts, as well as to place orders for new lines of service and new Sprint Phones.

45.     In and around October 2013, PRWeb disclosed that Linq had revenues of $57.5 million annually, and a growth rate of 1,892.4% over the last three years.  A true and correct copy of this article is attached hereto as **Exhibit E**.

46.     Defendant Linq was a former Sprint sub-dealer, but ended its sub-dealer relationship in and around 2006.  As a result, Defendant Linq is intimately familiar with Sprint's business model and Sprint's Terms and Conditions.  Despite this familiarity, Linq and the rest of the Defendants misappropriate the discounts Sprint provides to legitimate Sprint customers and willfully violate Sprint's Terms and Conditions or at the very least, induce Sprint customers to violate the Terms and Conditions.

47.     Defendants are not authorized Sprint dealers or retailers employees, supervisors, managers, agents or representatives.  Defendants have no legitimate connection to Sprint.

48.     In the process of ordering new, subsidized Sprint Phones, Defendants represent to Sprint that the account holder agrees to activate and use each Sprint Phone on its Sprint account and that the account holder agrees to enter into a wireless service agreement for a set term, generally, one to two years.  However, in many instances, Defendants have not obtained permission from the account holder to enter into a wireless service agreement with Sprint, and

Defendants are aware that the account holder has no intention of activating or using the new Sprint Phones on its account.

49.     For example, on December 13, 2013, Defendant Zimmerman called Sprint customer care and provided the account credentials for the Sprint account of The Healthy Back Store, and ordered 20 new Samsung Galaxy S II 4G Sprint Phones—10 for the subsidized price of $99.99 per Phone and 10 were received for no charge.  In order to secure these new Sprint Phones, Defendant Zimmerman represented to Sprint that The Healthy Back Store agreed to use the Phones subject to Sprint's Terms and Conditions and agreed to 24 month wireless service agreements for each of the 20 Sprint Phones.

50.     However, Defendant Zimmerman was aware that The Healthy Back Store had no intention of activating or using any of the 20 Sprint Phones on its account and Defendant Zimmerman had not obtained permission from The Healthy Back Store to enter into wireless service agreements on its behalf.  Moreover, none of the twenty (20) new Sprint Phones were activated or used on the account of The Healthy Back Store.  On information and belief, Defendants' resold each of these 20 Sprint Phones for a profit, and Defendant Zimmerman placed the order at the direction, or with the knowledge and consent of, the other Defendants.

51.     On November 2, 2012, Defendant Fulcher called Sprint customer care and provided the account credentials for the Sprint account of Dallas 1 Construction.  Defendant Fulcher proceeded to order 32 new Samsung Galaxy S III Sprint Phones for the subsidized price of $199.99 per Phone.   In order to secure these new Sprint Phones, Defendant Fulcher represented to Sprint that Dallas 1 Construction agreed to use the Phones subject to Sprint's

Terms and Conditions and agreed to 24 month wireless service agreements for each of the 32 Sprint Phones.

52.     However, Defendant Fulcher was aware that Dallas 1 Construction had no intention of activating or using any of the 32 Sprint Phones on its account and Defendant Fulcher had not obtained permission from Dallas 1 Construction to enter into wireless service agreements on its behalf.  None of the 32 new Sprint Phones were activated or used on the account of Dallas 1 Construction.  On information and belief, Defendants' resold each of these 32 Sprint Phones for a profit, and Defendant Fulcher placed the order at the direction, or with the knowledge and consent of, the other Defendants.

53.     A little over one month later, on January 18, 2013, Defendant Davis placed another order on the Sprint account of Dallas 1 Construction.  Defendant Davis called Sprint customer care, provided the account credentials for the Sprint account of Dallas 1 Construction and proceeded to order 21 new HTC Evo LTE Sprint Phones for the subsidized price of $0.99 per Phone.  In order to secure these new Sprint Phones, Defendant Davis represented to Sprint that Dallas 1 Construction agreed to use the Phones subject to Sprint's Terms and Conditions and agreed to 24 month wireless service agreements for each of the 21 Sprint Phones.

54.     However, Defendant Davis was aware that Dallas 1 Construction had no intention of activating or using any of the 21 Sprint Phones on its account and, on information and belief, Defendant Davis had not obtained permission from Dallas 1 Construction to agree to wireless service agreements on its behalf.  None of the twenty 21 new Sprint Phones were activated or used on the account of Dallas 1 Construction.  On information and belief, Defendants' resold

each of these 21 Sprint Phones for a profit, and Defendant Davis placed the order at the direction, or with the knowledge and consent of, the other Defendants.

55.     Upon information and belief, Defendants have engaged in similar transactions with over 40 of Sprint's customers and continue to unlawfully solicit Sprint customers.  With respect to these additional transactions, Defendants fraudulently purchased additional Sprint Phones at substantial discounts on Sprint customers' behalves and misrepresented the customers' agreement to abide by the Terms and Conditions.  Upon information and belief, Defendants took these actions without the customers' approval or knowledge.

56.     Defendants' fraudulent activities have caused significant damage to Sprint.  In addition to the inability to recoup its subsidy investment on the Sprint Phones resold by Defendants, and injury to Sprint's Marks and business reputation, on information and belief, Sprint has also lost important, legitimate Sprint customer accounts.

57.     Furthermore, Sprint has incurred substantial damages in its significant, proactive efforts to identify and remediate the effects of Defendants' fraudulent conduct on Sprint and its customers' accounts.  Defendants' fraudulent activities have caused irreparable harm to Sprint's business, image and reputation and Sprint's remediation of Defendants' actions has caused Sprint to incur significant additional losses.  Upon information and belief, this is only a portion of the fraud and illicit activity that Defendants and their co-conspirators are committing against Sprint and its customers.

**SUBSTANTIAL HARM CAUSED BY DEFENDANTS' MISCONDUCT**

58.      Defendants' actions substantially harm Sprint in several ways, including *inter alia*: (1) Sprint is deprived of the opportunity to recoup its substantial investment in Sprint Phones; (2)

Sprint is deprived of the opportunity to earn profits by providing wireless service to legitimate Sprint consumers; (3) Sprint is hampered in its ability to migrate its customers from older to newer technology through legitimate timely upgrades, which negatively impacts the efficiency of Sprint's wireless network speed; (4) Sprint's brand, image, and reputation are harmed by the inability to timely remove old Phone models from circulation through legitimate upgrades; (5) Defendants' actions seriously and irreparably interfere with Sprint's relationships with its dealers, retailers, and customers; and (6) Defendants' infringement of the Sprint name and Marks causes significant ongoing and irreparable losses and harm to Sprint's brand, image, and reputation.  All of these factors undermine Sprint's competitive edge in the cellular phone industry.

59.     The conduct of Defendants, their unknown co-conspirators, and others who engage in the unlawful acquisition and resale of new Sprint Phones has also resulted in shortages of available Sprint Phones, particularly the most in-demand models.   This misconduct substantially harms Sprint and its relationship with dealers, retailers and consumers because Sprint is not able to supply sufficient handsets to satisfy the demand from legitimate consumers who, as a result, go elsewhere for their telecommunications services.

60.     Sprint suffers additional, irreparable harm when its Phones are removed, by Defendants or their co-conspirators, from the original packaging and altered because Sprint is deprived of the means to control the quality of its product.  This becomes especially damaging where a potential legitimate Sprint customer within the United States acquires a Phone from Defendants or their co-conspirators, that the customer believes is a genuine Sprint Phone, with all of the attendant benefits and is later disappointed in Sprint because the Phone does not work as intended on the Sprint network because it has been denominated a Bad ESN Phone or otherwise.  Furthermore, the process

of unlocking and reselling a Sprint Phone voids the manufacturer's warranty on the device. The unlocked repackaged Sprint Phones are then resold without the original manufacturer's warranty documentation. Both consumers and Sprint are harmed when a Sprint Phone that has been altered or sold by Defendants or their co-conspirators is submitted for warranty repair. Consumers who purchase Sprint Phones from Defendants or their co-conspirators are unable to obtain warranty service in the event they experience problems with their Phones. As a result, Sprint's reputation suffers further.

61.     Additionally, confused customers, relying on the Sprint Marks on the Phones they purchased from Defendants, look to Sprint to resolve their questions. Sprint incurs substantial costs associated with calls to its customer relations and department to resolve the issues created by Defendants.

62.     Sprint's reputation is further damaged by its inability to assist those consumers who buy Sprint Phones from Defendants and/or Defendants' co-conspirators, because despite bearing the Sprint Marks, they are no longer valid Sprint Phones because the actions of Defendants and their co-conspirators voided the warranties and as Bad ESN phones, they cannot be activated on the Sprint network. Further, Sprint has spent significant time and effort, and the associated cost, for remedying Defendants' fraudulent actions within the Sprint system and attempting to resolve issues on legitimate Sprint accounts that were affected by Defendants' fraud.

63.     Defendants' conduct has resulted in the dilution of the Sprint Marks; substantial harm to Sprint's business reputation and goodwill; a greater likelihood of confusion, mistake,

and deception as to the source of origin of Sprint products unlawfully sold by the Defendants and confusion as to what if any relationship exists between Sprint and Defendants.

64.     As set forth above, part of Defendants and their co-conspirators' Scheme includes stealing legitimate customer upgrades by, *inter alia*, fraudulently requesting the subsidized handset upgrades available on the legitimate Sprint customer accounts that they target and retaining those new devices while the legitimate customers are left with outdated devices. The practice of stealing upgrade Phones not only misappropriates Sprint's investment in the new Phones, intended for the customer, but also hinders Sprint's objective of regularly migrating customers to newer devices that work more effectively on Sprint's updated networks.  This migration cannot occur when older devices remain in consumer circulation longer than intended. Defendants' conduct causes harm to Sprint's reputation with its customers, whose devices may no longer work on Sprint's network and other customers, who were defrauded out of their subsidized Phone upgrade, no longer have the ability to upgrade their phone if it breaks, and may blame Sprint and leave for another service provider.

65.     Defendants' Scheme also violates numerous state and federal identity theft, password-trafficking, and anti-phishing laws, including 18 U.S.C. § 1028(a)(7) (fraudulent transmission of identification information); 18 U.S.C. § 1029 (fraud in connection with access devices); 18 U.S.C. §1030 (fraud by computer); 18 U.S.C. §1341 (fraud by mail) and 18 U.S.C. §1343 (fraud by wire); and 18 U.S.C. §1346 (scheme to defraud), as well as the Telephone Records and Privacy Protection Act of 2006, 18 U.S.C. § 1039 ("TRAPPA"), which prohibits pretexting and other unauthorized access of telecommunications carriers' records.  Specifically, TRAPPA criminalizes, among other things: (a) making false or fraudulent statements or

representations to an employee or a customer of a telecommunications carrier; (b) accessing a telecommunications customer's account without authorization; (c) the unauthorized sale or transfer of customer records or information; and (d) the unauthorized purchase or receipt of customer records and information.   As discussed above, Defendants' conspiracy involves precisely this type of criminal conduct.

## CIVIL LITIGATION AGAINST OTHER PHONE TRAFFICKERS

66. Federal courts have recognized that conduct similar to Defendants' conduct is unlawful.

67. In addition to Sprint, T-Mobile USA, Inc., TracFone Wireless, Inc., Nokia Corporation, and AT&T Mobility LLC have each filed multiple lawsuits in numerous federal courts across the country against other traffickers engaged in the practice of defrauding legitimate consumers by acquiring large quantities of wireless telephones and reselling them for profit.   Each of those companies has succeeded in obtaining Final Judgments and Permanent Injunctions.   Copies of several examples of Final Judgments and Permanent Injunctions are attached hereto as **Composite Exhibit F**.   A defendant in one case who continued trafficking in phones in violation of an injunction issued by the U.S. District Court for the Southern District of Texas was charged with criminal contempt of court and sentenced to serve 57 months in prison. Copies of the Memorandum Opinion and Order of Contempt, Application for Criminal Contempt, the Order finding cause to believe the defendant is guilty of criminal contempt, and Judgment of Criminal Contempt are attached hereto as **Composite Exhibit G**.

## CRIMINAL INVESTIGATION AND
## PROSECUTION OF PHONE TRAFFICKING

68.    Phone traffickers like Defendants have been the subject of numerous criminal investigations and prosecutions across the country.  Some examples are:

a.    In August 2014, the United States Attorney for the District of Minnesota announced the indictment of 20 individuals engaged in the illegal acquisition and resale of tens of thousands of Smartphones to the black markets of the Middle East and China.  A joint task force comprised of the U.S. Secret Service, the Minnesota Financial Crimes Task Force, and the St. Paul Police Department investigated and then apprehended members of the "Mustafa Organization," who had been using runners, engaged in contract and subscription fraud, and robbery to acquire large quantities of subsidized phones for overseas resale.

b.    In March 2013, the California Attorney General charged two individuals with trafficking nearly $4M in wireless phones to Hong Kong over an 8 month period.

c.    On or about February 25, 2013, federal law enforcement authorities, including agents from the Federal Bureau of Investigation, the United States Secret Service, and the Bureau of Alcohol, Tobacco, Firearms and Explosives, raided a warehouse belonging to a phone trafficking company called Wireless Buybacks in Elkridge, Maryland, pursuant to a search warrant and found the facilities were being used to harbor stolen Sprint Phones.  Sprint filed suit against Wireless Buybacks and its affiliates the following day.  Wireless Buybacks is owned by Defendants Lowe and Skelly and is one of Defendants' co-conspirators.

d.    On August 21, 2012, federal Homeland Security agents and SWAT teams conducted a raid on facilities operated by handset trafficker Ace Wholesale and

on the home of the company's CEO, Jason Floarea.  Later the same day, Sprint filed suit in federal court against Ace Wholesale, Floarea, and several affiliated entities and persons asserting handset trafficking claims similar to those asserted here.  On October 16, 2014, Mr. Floarea, pled guilty to Interstate Transportation of Stolen Property, in part in connection with trafficking Sprint Phones.

e.     An FBI sting operation in Philadelphia that began with wireless phone trafficking resulted in the conviction of 16 individuals on terrorism charges, when it turned out that the proceeds from their phone trafficking and other illegal conduct was being funneled to the terrorist organization Hezbollah.

Copies of court documents, press releases, and news reports regarding these incidents are attached hereto as **Composite Exhibit H**.

<u>**COUNT ONE**</u>

**UNFAIR COMPETITION**

69.     Sprint reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

70.     Defendants' conduct in purchasing and/or inducing others to purchase the Phones, disabling or unlocking, inducing others to disable or unlock, and/or assisting others to disable or unlock the Phones, and reselling and/or assisting others to resell the Phones as new for activation on other wireless networks and/or for use in insurance replacement programs constitutes unfair competition under the common law of the State of Maryland.

71.     Defendants gain control of legitimate Sprint customer accounts for the purpose of acquiring subsidized Sprint Phones for resale, which constitutes unfair competition under the common law of the State of Maryland.

72.     Defendants' conduct in selling, inducing others to sell, and/or assisting others to sell Sprint Phones, which undermines Sprint's subsidy program, constitutes unfair competition under the common law of the State of Maryland.

73.     Defendants' use of at least one of the Sprint Marks in connection with the sale of materially different Sprint Phones has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' products and services, and the relationship between Sprint and Defendants.   Thus, Defendants have also engaged in unfair competition with Sprint in violation of the common law of Maryland by selling and/or offering, and promoting their products with the intention of trading upon the goodwill established by Sprint and are thereby misappropriating the benefits of substantial effort and money expended by Sprint in establishing its rights in and to the Sprint Marks.

74.     Defendants' actions were done in bad faith; they were intentional, malicious, and willful, and have caused substantial harm to Sprint.

75.     Sprint is entitled to appropriate relief as prayed for hereinafter, including injunctive relief.

## COUNT TWO

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND PROSPECTIVE ADVANTAGE

76.     Sprint reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

77.     A business relationship, and an expectancy of business relationships, exists between Sprint and authorized dealers of Sprint Phones.

78.     A business relationship, and an expectancy of business relationships, exists between Sprint and authorized retailers of Sprint Phones like Best Buy Co., Inc.

79.     A business relationship, and an expectancy of business relationships, exists between Sprint and the purchasers and prospective purchasers of its Sprint Phones and wireless service, including, but not limited to, Dallas 1 Construction, The Healthy Back Store, Breedan Mechanical, Inc. and Minkoff Co.

80.     There is a high probability of future economic benefit to Sprint as a result of these current and prospective business relationships.

81.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these current and prospective business relationships between Sprint, authorized dealers and retailers who sell Sprint products, and legitimate Sprint customers or prospective customers.

82.     Specifically, but without limitation, Defendants knew that Sprint has business relationships, and an expectancy of business relationships, with legitimate consumers of Sprint Phones and wireless service.  Defendants interfered with these relationships by engaging in their Bulk Handset Trafficking Scheme and causing, at least in part, Sprint to have an insufficient supply of Sprint Phones available to meet legitimate consumer demand.  Defendants also interfered with the contractual relationships that existed between Sprint and its legitimate Sprint customers by inducing the customers to breach their contracts with Sprint.

83.     Defendants also knew that Sprint has business relationships with authorized dealers and retailers of Sprint Phones to provide said dealers with sufficient quantities of Sprint Phones for their legitimate consumers' use exclusively on Sprint's wireless network. Defendants' Bulk Handset Trafficking Scheme has resulted in substantial numbers of Sprint Phones that are never activated on Sprint service and has further caused shortages of available Sprint Phones, thereby substantially harming Sprint and its relationship with its authorized dealers and retailers because Sprint is unable to supply dealers with sufficient Phones to satisfy the demands from legitimate consumers.

84.     Defendants know that Sprint has business relationships, and an expectancy of business relationships, with companies and retailers offering insurance protection plans for Sprint Phones.  Defendants interfere with these relationships by engaging in their Bulk Handset Trafficking Scheme.

85.     Defendants are intentionally interfering with Sprint's business relationships and prospective advantages through improper means and in violation of the law.

86.     Defendants engaged in the acts of interference set forth herein with a conscious desire to prevent the relationships from occurring or continuing, or Defendants knew that the interference was certain or substantially certain to occur as a result of their conduct.

87.     Sprint has been proximately damaged and continues to be damaged as a result of Defendants' interference.

88.     There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' tortious interference.

## **COUNT THREE**

**TORTIOUS INTERFERENCE WITH CONTRACT**

89.     Sprint reasserts the allegations set forth in Paragraphs 1 through 62 above as though fully set forth herein.

90.     A contractual relationship exists between Sprint and authorized dealers and retailers of Sprint Phones.

91.     A contractual relationship exists between Sprint and its customers, the purchasers of Sprint Phones and wireless service.

92.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these contracts between Sprint, and its authorized dealers and retailers and legitimate Sprint customers.

93.     Specifically, but without limitation, Defendants knew that Sprint has contractual relationships with legitimate consumers of Sprint Phones and wireless service.  Defendants interfered with these relationships by inducing Sprint customers to breach their contracts with Sprint by, *inter alia*, reselling their Phones to Defendants.

94.     Defendants also knew that Sprint has contractual relationships with authorized dealers and retailers of Sprint Phones under which these dealers and retailers will promote and sell Sprint products solely for activation on the Sprint network.  On information and belief, Defendants and/or their co-conspirators induce authorized Sprint dealers and retailers to breach their agreements with Sprint and provide new Sprint Phones to Defendants for a purpose other than a legitimate and lawful activation on the Sprint network and at a financial loss to Sprint.

95.     Defendants engaged in the acts of interference set forth herein with a conscious desire to induce breach of contract, or Defendants knew that breach of contract was certain or substantially certain to occur as a result of their conduct.

96.     Sprint has been proximately damaged and continues to be damaged as a result of Defendants' interference.

97.     There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' tortious interference.

**COUNT FOUR**

**CIVIL CONSPIRACY**

98.     Sprint reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

99.     An agreement and conspiracy existed and continues to exist between and among the Defendants and other co-conspirators to unlawfully bulk purchase, traffic, and resell materially different Sprint Phones, which results in federal common law and statutory trademark infringement, common law unfair competition, contributory trademark infringement, tortious interference with business relationships and prospective advantage, tortious interference with contract, unjust enrichment, and violations of the Computer Fraud and Abuse Act, among other things.

100.    Each Defendant knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy as set forth with more particularity in this Complaint.

101.    Sprint has been proximately damaged by the conspiracy and Defendants' actions in furtherance thereof.

102.    There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' conspiracy.

## COUNT FIVE

### UNJUST ENRICHMENT

103.    Sprint reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

104.    By bulk purchasing Sprint Phones at less than the manufacturer cost of the Phones for use on wireless networks other than Sprint's network and/or for use by major retailers in their warranty programs, Defendants have obtained benefits from Sprint which have caused significant harm to Sprint and led to significant financial gain to Defendants through their resale of the bulk purchased Sprint Phones.

105.    Defendants have acquired the benefits voluntarily and with full knowledge of the benefits.

106.    Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying Sprint the value of the benefits Defendants acquired.

107.    There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' unjust enrichment.

## COUNT SIX

### CONSPIRACY TO INDUCE BREACH OF CONTRACT

108.    Sprint reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

109.    Defendants solicit legitimate Sprint customers for the ostensible purpose of administering their Sprint accounts, but subsequently persuade these Sprint customers to purchase Sprint Phones in bulk for the benefit of Defendants.

110.    Sprint had valid and existing contracts with these legitimate Sprint customers. Defendants had knowledge of these contracts between Sprint and legitimate Sprint customers, and intended to, and in fact did, induce the legitimate Sprint customers to breach their contracts with Sprint.

111.    The breaches of the contracts were proximately caused by Defendants' misconduct.

112.    Sprint suffered damages as a result.

## COUNT SEVEN

### COMMON LAW FRAUD AND FRAUDULENT MISREPRESENTATION

113.    Sprint reasserts the allegations set forth in Paragraphs 1 through 62 above as though fully set forth herein.

114.    As part of the Bulk Handset Trafficking Scheme, each of the Defendants, directly or indirectly through co-conspirators, regularly and systematically misrepresents and makes fraudulent statements to Sprint that they are legitimate Sprint account holders or other persons authorized to enter into wireless service agreements with Sprint, that the Phones are being acquired by a legitimate account holder for a legitimate purpose, that the Phones will be used on Sprint's wireless network, and that they will perform in accordance with the Terms and Conditions.

115.     On information and belief, each Defendant participated in defrauding Sprint, and its legitimate customers, retailers, and dealers, to acquire new Sprint Phones and devices, including the models identified *supra*, for unlawful resale.

116.     Defendants knowingly and intentionally misrepresent themselves as being authorized to enter into wireless service agreements on behalf of Sprint account holders to fraudulently obtain Sprint Phones which they know will not be used in accordance with the Terms and Conditions.

117.     When Defendants, directly or through their co-conspirators, acquire Sprint Phones as part of the Scheme, they know they do not have authority to enter into wireless service agreements on behalf of legitimate Sprint account holders, do not intend to use the Phones for a legitimate purpose, or otherwise perform in accordance with the Terms and Conditions.

118.     Defendants and their co-conspirators know that they are required to activate the Sprint Phones on the Sprint account that the Phones were ordered on for use on the Sprint wireless network, pay the monthly service charges, and otherwise comply with the Terms and Conditions.

119.     Defendants intend for Sprint to rely on their misrepresentations, and/or the misrepresentations of their co-conspirators.

120.     Sprint's reliance on the misrepresentations of Defendants and their co-conspirators was reasonable under the circumstances, namely, because Defendants had account verification information such as PINs and passwords that allowed them to access the Sprint for improper purposes.

121.     Sprint has been damaged and continues to suffer damages as a result of Defendants' actions.

122.     There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' fraud.

## COUNT EIGHT

### TRAFFICKING IN COMPUTER PASSWORDS
### 18 U.S.C. § 1030(a)(6)

123.     Sprint reasserts the allegations set forth in Paragraphs 1 through 62 above as though fully set forth herein.

124.     The Sprint Phones that are trafficked by Defendants and/or their co-conspirators are loaded with confidential codes/passwords that access: (a) Sprint's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Sprint's computer billing network (collectively, "Sprint's protected computer networks").   As such, the Phones act as a gateway to Sprint's protected computer networks.   Sprint protects and restricts access to its customers' accounts and its proprietary protected computer networks through, among other things, the confidential codes/passwords contained in the Phones, by requiring personal identifying information, such as PINs, passwords, and/or social security numbers or other confidential information to access, make changes, or place orders on customers' accounts ("security codes").

125.     Through their Scheme, Defendants are knowingly trafficking in the confidential security codes with the intent to defraud Sprint.

126.     In order to obtain new, subsidized Phones, Defendants illicitly and/or fraudulently acquire confidential security codes to unlawfully gain access to Sprint's protected computer networks.

127.     Upon information and belief, once Defendants illicitly acquire the Sprint Phones, they use Sprint's confidential codes/passwords to gain additional access to Sprint's protected computer networks.   This additional access into Sprint's protected computer networks is not authorized in any way.   Upon information and belief, Defendants share these confidential codes/passwords and methodologies for unlocking Sprint Phones among themselves and with their co-conspirators.

128.     Upon information and belief, Defendants acquire the unlocking codes/passwords and methodologies for unlocking Sprint Phones by misrepresenting to Sprint, either directly or through one of their co-conspirators, that the Phones are being acquired and unlocked for a legitimate purpose for use by legitimate consumers on Sprint's computer networks, when in fact, they are not.

129.     Upon information and belief, Defendants unlawfully access Sprint's protected computer networks using Sprint's confidential codes/passwords to: (1) place orders for equipment and/or service by entering into wireless service agreements that are not authorized by the account holder; (2) perform various tests to confirm that the Phone they are purchasing is, in fact, active on Sprint's wireless network; (3) unlock the Sprint Phone, which requires the manipulation and oftentimes permanent deletion of the proprietary software that is installed in Sprint Phones, so that the Sprint Phone will operate on other wireless networks; and/or (4) make unauthorized changes to Sprint's protected computer networks and/or confidential security codes.

130.    Through the Scheme, Defendants are knowingly trafficking in the confidential security codes with the intent to defraud and harm Sprint.

131.    Defendants' transfer of the Phones and confidential security codes to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029 in that the confidential security codes were transferred, or otherwise disposed of, to others, or Defendants obtained control of the confidential security codes with intent to transfer or dispose of them.

132.    Defendants' trafficking of the Phones and/or confidential security codes substantially affects interstate commerce and communication in that the confidential security codes are trafficked over the internet, throughout the United States, and around the world, and Sprint's protected computer networks are used in and affect interstate commerce and communication, and provide wireless communications services pursuant to licenses issued by the Federal Communications Commission.

133.    Defendants' trafficking of Sprint's confidential security codes has caused and will continue to cause Sprint to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

134.    With respect to loss, Sprint has spent well in excess of $5,000 over a one-year period assessing its hacked protected computer networks for damage and taking steps to upgrade Sprint's protected computer networks' defenses to prevent future unauthorized access by Defendants and/or their co-conspirators.

135.    Also with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period investigating Defendants' intrusions into Sprint's protected computer networks,

assessing the possible impairment to the integrity of its protected computer networks, taking action to counteract Defendants' theft, and conducting a damage assessment regarding Defendants' collection and dissemination of Sprint Phones and security codes, as well as tracking down fraudulently sold Phones.

136.    Moreover, with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period in costs in order to discover Defendants' identities and/or the methods by which Defendants' access Sprint's protected computer networks without authorization.

137.    With respect to damage, by infiltrating the Sprint computer and telecommunications network and collecting and disseminating the illegally activated Phones and confidential security codes, Defendants have substantially impaired the integrity of Sprint's protected computer networks in an amount in excess of $5,000.  Moreover, Defendants' actions have deprived Sprint of the means to control the quality of its products and services.

138.    Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

139.    Defendants' conduct is intentional, malicious and willful.

140.    Pursuant to 18 U.S.C. § 1030(g), Sprint is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Sprint and its customers as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT NINE

### UNAUTHORIZED ACCESS
### 18 U.S.C. § 1030(a)(5)(C)

141.    Sprint reasserts the allegations set forth in Paragraphs 1 through 62 above as though fully set forth herein.

142.    The Sprint Phones that are acquired by the Defendants, directly and/or from their co-conspirators in furtherance of the Scheme, are loaded with codes/passwords that access: (a) Sprint's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Sprint's computer billing network (collectively, "Sprint's protected computer networks").   As such, the Phones act as a gateway to Sprint's protected computer networks.   Moreover, Sprint protects and restricts access to its customers' accounts and its proprietary protected computer networks through, among other things, the confidential codes/passwords contained in the Phones, by requiring personal identifying information, such as PINs, passwords, and/or social security numbers or other confidential information to access, make changes, or place orders on customers' accounts ("security codes").

143.    Sprint Phones are connected to and activated on Sprint's protected computer networks when purchased from Sprint.

144.    Sprint's proprietary computer system holds confidential information and provides access to Sprint customer accounts.   It is connected to the internet, and assists in providing federally-regulated telecommunications services.   Sprint's computer systems are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

145.     Through fraudulent means, Defendants and their co-conspirators improperly obtain the identifying security information necessary to access, place orders, and make changes to Sprint accounts.

146.     Defendants knowingly and with the intent to defraud, cause Sprint to access its proprietary computer systems.  Defendants are not authorized to do so.

147.     Further, by illicitly acquiring and/or unlocking the Phones, Defendants and/or their co-conspirators necessarily access the Sprint protected computer networks because the Phones are connected to those networks when acquired from Sprint.

148.     Defendants use fraud and misrepresentations to acquire the Phones from Sprint, and, as such, Defendants' access of Sprint's protected computer networks is not authorized in any way.

149.     Upon information and belief, when Defendants acquire a Sprint Phone, Defendants and/or their co-conspirators carefully examine the Phone, turn it on, and perform various tests to confirm that the Phone they are purchasing is, in fact, active on Sprint's wireless network and that the various security codes, electronic code numbers and access numbers loaded on the Phone are correct.  This too constitutes unauthorized access of Sprint's protected computer networks via a password obtained through fraud and misrepresentation.

150.     By trafficking in activated Sprint Phones, the Defendants are also knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of Sprint's protected computer networks.

151.     Defendants' illegal and unauthorized access of Sprint's protected computer systems allows them to improperly steal Sprint's investment in its Phones.

152.    Through this improper access, Defendants knowingly cause Sprint to make changes to customer accounts that Sprint would not otherwise make, such as adding additional phone lines and/or placing orders for equipment.

153.    Defendants' activities substantially affect interstate commerce and communication in that the Phones are trafficked over the internet, throughout the United States, and around the world, and Sprint's computer system and telecommunications network are used in and affect interstate commerce and communication, and provide wireless communications services pursuant to licenses issued by the Federal Communications Commission.

154.    Defendants' unauthorized access of Sprint's protected computer systems has caused and will continue to cause Sprint to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

155.    With respect to loss, Sprint has lost its investments in the Phones and security codes and spent well in excess of $5,000 investigating and assessing the possible impairment to the integrity of its protected computer systems, taking remedial action to counteract Defendants' intrusions, and conducting a damage assessment regarding Defendants' unauthorized access of customer accounts and collection and dissemination of Sprint Phones, as well as tracking down fraudulently sold Phones and attempting to resolve customer disputes.

156.    Moreover, with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants accessed Sprint's protected computer networks without authorization.

157. With respect to damage, by infiltrating the Sprint computer systems and collecting and disseminating the illegally trafficked Phones and security codes, Defendants have substantially impaired the integrity of Sprint's systems in an amount in excess of $5,000. Moreover, Defendants' actions have deprived Sprint of the means to control the quality of its product and service, and have stolen Sprint's financial investment in its Phones.

158. Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

159. Defendants' conduct is intentional, malicious and willful.

160. Pursuant to 18 U.S.C. § 1030(g), Sprint is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Sprint and its customers as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT TEN

### UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD
### 18 U.S.C. § 1030(a)(4)

161. Sprint reasserts the allegations set forth in Paragraphs 1 through 62 above as though fully set forth herein.

162. Sprint protects access to its proprietary computer system, by requiring personal identifying information, such as PINs, passwords and/or social security numbers, to make changes to its customers' accounts.

163.    Sprint's proprietary computer system stores confidential information.   It is connected to the internet, and assists in providing federally-regulated telecommunications services.   Sprint's computer systems are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

164.    Through fraudulent means, Defendants and their co-conspirators improperly obtain customer information, including confidential PINs, passwords and/or social security numbers, and other identifiers necessary to access and make changes to Sprint customers' accounts.

165.    Using these improperly obtained "pass-codes," Defendants knowingly and with the intent to defraud, cause Sprint to access its proprietary computer systems and make unauthorized changes to Sprint accounts.   Defendants are not authorized to do so.   Defendants' conduct also exceeds authorized access, as defined by Section 1030(e)(6) of the Computer Fraud and Abuse Act, in that Defendants access Sprint's proprietary computer systems and Sprint accounts by misrepresenting that they are authorized to access such systems, and Defendants use such access to alter customer accounts, change access, and place orders for Sprint products in the Sprint computer system (which they were not entitled to alter or obtain).

166.    Sprint's customer accounts and proprietary computer systems are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

167.    Through this improper access, Defendants knowingly further their fraudulent Scheme and cause Sprint to make changes to customer accounts that Sprint would not otherwise

make, such as adding lines of service, changing the address or email address on the account, and ordering equipment.

168.    By means of the above-described conduct, Defendants further their fraudulent Scheme to obtain handsets, service, and other benefits with significant value for their profit and to the detriment of Sprint and its customers.

169.    Defendants' activities substantially affect interstate commerce and communication in that the Phones and improperly accessed accounts and proprietary computer systems are all used in and affect interstate commerce and communication.

170.    Defendants' unauthorized access of Sprint's customer accounts and protected computer systems has caused and will continue to cause Sprint to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively -- substantially in excess of $5,000 over a one-year period.

171.    With respect to loss, Sprint has spent well in excess of $5,000 over a one-year period assessing its hacked protected computer networks for damage and taking steps to upgrade Sprint's protected computer networks' defenses to prevent future unauthorized access by Defendants and/or their co-conspirators.

172.    In addition, with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period identifying the impairment of or damage to Sprint's protected computer networks that Defendants' and/or their co-conspirators accessed with authorization.

173.    Further, with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period in costs associated with investigating Defendants' and/or their co-conspirators' intrusions into Sprint's protected computer networks and taking subsequent remedial measures.

174.    Moreover, with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period in costs in order to discover Defendants' identity and/or the method by which Defendants accessed Sprint's protected computer networks without authorization.

175.    With respect to damage, by infiltrating the Sprint computer network and stealing service and equipment, disseminating illegally obtained Phones, and changing legitimate customer account information, Defendants have substantially impaired the integrity of Sprint's systems in an amount in excess of $5,000.   Moreover, Defendants' actions have deprived Sprint of the opportunity to control the quality of its products and service, as well as to earn revenue from legitimate customers, and to recoup Sprint's investment in the Phones unlawfully obtained by Defendants.

176.    Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

177.    Defendants' conduct is intentional, fraudulent, malicious and willful.

178.    Pursuant to 18 U.S.C. § 1030(g), Sprint is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Sprint and its customers as a result of Defendants' conduct during any one year period aggregated is at least $5,000 in value.

## COUNT ELEVEN

**FEDERAL TRADEMARK INFRINGEMENT**
**15 U.S.C. 1114 [§32(1) of the Lanham Act]**

179.    Sprint reasserts the allegations set forth in Paragraphs 1 through 62 above as though fully set forth herein.

180.    Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of certain federally-registered Sprint Communications Marks without authorization in connection with their conspiracy to sell and offer for sale materially different Sprint Phones, which downstream customers will discover have been altered from their original state and do not include the warranties, accessories, manuals and related items that constitute part of the Sprint Phone package.

181.    Defendants' and/or their co-conspirators' use of certain federally-registered Sprint Communications Marks in connection with the sale of Sprint Phones has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between Sprint Communications and Defendants.

182.    Defendants' and/or their co-conspirators' unauthorized use of certain federally-registered Sprint Communications Marks in connection with their fraudulent enterprise to steal from Sprint and its customers is likely to continue in the future, all to the great and irreparable damage to the business, reputation, and goodwill of Sprint Communications.

183.    Defendants' and/or their co-conspirators' use of certain federally-registered Sprint Communications Marks in connection with the materially different Sprint Phones, which do not include warranties, manuals, accessories and related items made part of the Sprint Phone package, and have been flagged as "Bad ESN" Phones and not able to be activated on the Sprint network, constitutes a misappropriation of Sprint Communications' distinguishing and

identifying federally-registered trademarks that were created as a result of significant effort and expense by Sprint Communications over a long period of time.

184.     Defendants' and/or their co-conspirators' use of certain federally-registered Sprint Communications Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with Sprint Communications, and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Sprint Communications.

185.     Defendants have damaged, and will continue to damage, Sprint Communications and the reputation and goodwill of Sprint Communications, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of Sprint Communications.

186.     Sprint Communications is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

187.     Defendants' aforesaid acts constitute willful infringement of Sprint Communications' aforementioned federally registered trademarks in violation of 15 U.S.C. § 1114.

## COUNT TWELVE

### FEDERAL COMMON LAW TRADEMARK INFRINGEMENT AND FALSE ADVERTISING
### 15 U.S.C. § 1125 (a)(1)(A) and (B) [§43(a) of the Lanham Act]

188.     Sprint reasserts the allegations set forth in Paragraphs 1 through 62 above as though fully set forth herein.

189.     Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of at least one of the Sprint Marks without authorization in connection with their conspiracy to sell and offer for sale materially different Sprint Phones, which downstream customers will discover have been altered from their original state, are inoperable on the Sprint network, and do not include the warranties, accessories, manuals and related items that constitute part of the Sprint Phone package.

190.     Defendants' and/or their co-conspirators' use of at least one of the Sprint Marks in connection with the sale of materially different Sprint Phones has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' products, and the relationship between Sprint and Defendants.

191.     Defendants' and/or their co-conspirators' unauthorized use of at least one of the Sprint Marks in connection with their fraudulent enterprise to steal from Sprint and its customers is likely to continue in the future, all to the great and irreparable damage to the business, reputation, and goodwill of Sprint.

192.     Defendants' and/or their co-conspirators' use of at least one of the Sprint Marks in connection with the materially different Sprint Phones, which do not include warranties, manuals, accessories and related items made part of the Sprint Phone package, and may have been flagged as "Bad ESN" Phones and not able to be activated on the Sprint network, constitutes a misappropriation of at least one of the distinguishing and identifying Sprint Marks that was created as a result of significant effort and expense.

193.     Defendants' and/or their co-conspirators' use of at least one of the Sprint Marks, coupled with their false representations, evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants

have some connection, association or affiliation with Sprint, and thus constitutes false designation of origin and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Sprint.  Defendants are not connected, employed by, or otherwise affiliated with Sprint in any way.

194.    Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Sprint and the reputation and goodwill of Sprint, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of Sprint.

195.    Sprint is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

196.    Defendants' use of at least one of the Sprint Marks in commercial advertising or promotion misrepresents the nature, characteristics, and/or qualities of their infringing products. Defendants' advertising and promotion is false or misleading.  Defendants' advertising and promotion deceives or has the capacity to deceive consumers.  The deception and misrepresentations have a material effect on the purchasing decisions and affect interstate commerce.

197.    Defendants' activities constitute false designation of origin, false descriptions and representations, and false advertising in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B).

198.    Sprint is entitled to appropriate relief as prayed for hereinafter, including preliminary and permanent injunctive relief.

199.    Defendants knew or should have known that Plaintiffs are the owners and/or authorized licensees of the Sprint Marks and that Defendants had no legal right to use any of the Sprint Marks on their infringing products.

200.    Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, so as to justify the assessment of exemplary damages and an award of Plaintiffs' lost profits, Defendants' profits, and Plaintiffs' attorneys' fees.

**COUNT THIRTEEN**

**CONTRIBUTORY TRADEMARK INFRINGEMENT**

201.    Sprint reasserts the allegations set forth in Paragraphs 1 through 62 above as though fully set forth herein.

202.    By misappropriating and using at least one of the Sprint Marks in connection with the Scheme, Defendants knowingly aided and enabled distributors and/or sellers of their products to market them to members of the general public in a way that infringes at least one of the Sprint Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

203.    Defendants' unlawful, unauthorized, and unlicensed sale of the materially different Sprint Phones has contributed to the creation of express and implied misrepresentations that the Sprint Phones, as sold by Defendants, who falsely represent themselves as Sprint employees and customers, were created, authorized or approved by Sprint, may be activated on the Sprint network, and include warranties.

204.    Upon information and belief, Defendants' conduct leads to post-sale confusion by causing consumers who purchase Sprint Phones altered by Defendants to believe that they are

purchasing handsets approved by Sprint that can be activated on the Sprint network and containing original warranties.

205.     Defendants' conduct constitutes contributory infringement in violation of the Trademark Act.  Defendants' conduct is intentional, malicious, and willful.

206.     Sprint has been damaged and continues to suffer damages as a result of Defendants' actions.

207.     There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' actions.

**COUNT FOURTEEN**

**CONVERSION**

208.     Sprint reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

209.     Defendants have and are engaged in acts of conversion in violation of the law of the State of Maryland.

210.     Sprint has the right to provide its Phones and wireless service to the public. Defendants have no such privilege or right.

211.     Defendants knew or should have known that they obtained the Phones through illegitimate means and had no legal right to advertise, use or resell them.

212.     Defendants are wrongfully interfering with Sprint's rights by engaging in the Bulk Handset Trafficking Scheme.

213.     Defendants intentionally and willfully exerted dominion and ownership over the Sprint Phones.

214.    Defendants' conversion of Sprint's property has caused and continues to cause Sprint to suffer irreparable injury, loss of reputation, and exemplary damages to be proved at trial.  Unless enjoined by this Court, Defendants will continue these acts, thereby causing Sprint further immediate and irreparable damage.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

WHEREFORE, Plaintiffs, Sprint Solutions, Inc. and Sprint Communications Company L.P., respectfully request that this Court enter final judgment and permanent injunctive relief in favor of Plaintiffs and against Defendants, as follows:

(a) awarding Plaintiffs their compensatory, consequential, statutory and special damages including, without limitation, their lost profits, Defendants' profits, loss of goodwill and damage to its reputation, corrective advertising damages, as well as exemplary damages, together with pre and post judgment interest, as provided by law;

(b) awarding Plaintiffs their reasonable attorneys' fees and costs associated with this action;

(c) granting permanent injunctive relief in favor of Plaintiffs and against Defendants enjoining Defendants from engaging in the unlawful practices described in this Complaint;

(d) requiring Defendants, pursuant to the Lanham Act, to deliver to Plaintiffs their entire inventory of phones and products bearing or infringing the Sprint Marks or a confusingly similar copy thereof; and

(e) granting such further relief as this Court deems just and proper.

Dated:  September 30, 2015.

By: : _____/s/_____
Brian P. Perryman
USDC MD Bar No. 16595
Email: bperryman@cfjblaw.com
CARLTON FIELDS JORDEN BURT, P.A.
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC  20007-5208
Phone: (202) 965-8100
Fax: (202) 965-8104

And

James B. Baldinger
Florida Bar No. 869899
Email:  jbaldinger@cfjblaw.com
Stacey K. Sutton
Florida Bar No. 0289530
Email: ssutton@cfjblaw.com
CARLTON FIELDS JORDEN BURT, P.A.
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida  33401
Phone: (561) 659-7070
Fax: (561) 659-7368

Gail E. Podolsky
Georgia Bar No. 142021
Email: gpodolsky@cfjblaw.com
CARLTON FIELDS JORDEN BURT, P.A.
One Atlantic Center
1201 West Peachtree Street, Suite 3000
Atlanta, Georgia 30309
Phone: (404) 815-2714
Fax: (404) 815-3415

*Attorneys for Sprint Solutions, Inc. and
Sprint Communications Company, L.P.*